Slip Op. 03-138

UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>FORMER EMPLOYEES OF<br>AMERIPHONE, INC.,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td><em>Plaintiffs,</em></td><td>:</td><td></td></tr>
<tr><td>v.</td><td>:</td><td>Court No. 03-00243</td></tr>
<tr><td>UNITED STATES,</td><td>:</td><td></td></tr>
<tr><td><em>Defendant.</em></td><td>:</td><td></td></tr>
</table>

[Final Corrected Remand Determination, certifying Plaintiffs as eligible to apply for NAFTA-TAA benefits, is sustained.]

Decided: October 24, 2003

Michael H. Greenberg, for Plaintiffs.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Patricia McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Stefan Shaibani); Charles D. Raymond, Associate Solicitor for Employment and Training Legal Services, Office of the Solicitor, United States Department of Labor (Gary E. Bernstecker), Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

Plaintiffs ("the Workers") – former employees of Ameriphone, Inc., a wholly owned subsidiary of Plantronics, Inc., Garden Grove, California ("Ameriphone") – brought this action to contest the determination of the U.S. Department of Labor ("Labor Department") denying their petition for certification of eligibility for transitional adjustment assistance benefits under the North

American Free Trade Agreement ("NAFTA") Implementation Act ("NAFTA-TAA benefits"). *See*

Letter to Court from D. Arnston, dated May 5, 2003 ("Complaint"); 67 Fed. Reg. 61,160, 61,162

(Sept. 27, 2002); 68 Fed. Reg. 12,938 (March 18, 2003); A.R. 22, 26; A.R. 37-38.[1] Jurisdiction lies

under 28 U.S.C. § 1581(d)(1) (2000).

Pending before the Court is the Labor Department's Notice of Revised Determination on

Remand (Corrected: October 1, 2003) ("Final Corrected Remand Determination"), which certifies

that:

> All workers of Ameriphone, Inc., . . . who became totally or partially separated from
> employment on or after June 24, 2001 through two years of this certification [dated
> October 1, 2003], are eligible to apply for NAFTA-TAA [benefits] under Section 250
> of the Trade Act of 1974.

68 Fed. Reg. 60,120 (Oct. 21, 2003). The Workers have advised that they are satisfied with that

certification. Accordingly, with the observations and clarifications set forth below, the Labor

Department's Final Corrected Remand Determination is sustained.

## I.  Background

### A.  The Trade Adjustment Assistance Laws

Modeled generally on the trade adjustment assistance program under the Trade Act of 1974,

19 U.S.C. § 2271 *et seq.* (2000), the NAFTA-TAA program entitles certain workers whose job losses

are attributable to increased import competition from – or shifts in production to – Canada or Mexico

---

[1]Because the administrative record in this action includes confidential information, two versions of that record were prepared. Citations to the public administrative record are noted as "A.R.," while citations to the confidential version are noted as "C.A.R.". The supplemental administrative record, developed on remand, is paginated to follow the record of the initial investigation, and begins with page 44.

to receive benefits including employment services, appropriate training, job search and relocation allowances, and income support payments.[2]  19 U.S.C. § 2331 (2000).  *See generally* Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, 26 CIT ____, ____, 245 F. Supp. 2d 1312, 1317-18 (2002) ("Chevron I").

The trade adjustment assistance laws are remedial legislation and, as such, are to be construed broadly to effectuate their intended purpose.  *See generally* Woodrum v. Donovan, 5 CIT 191, 198, 564 F. Supp. 826, 832 (1983) (*citing* United Shoe Workers of Am. v. Bedell, 506 F.2d 174, 187 (D.C. Cir. 1974)), *aff'd*, 737 F.2d 1575 (Fed. Cir. 1984).  *See also* Former Employees of Champion Aviation Prods. v. Herman, 23 CIT 349, 352 (1999) (citations omitted) (NAFTA-TAA statute is remedial legislation, to be construed broadly); Chevron I, 26 CIT at ____, 245 F. Supp. 2d at 1318 (citations omitted) (same).  Moreover, both "because of the *ex parte* nature of the certification process, and the remedial purpose of [the statutes], the [Labor Department] is obliged to conduct [its] investigation with the utmost regard for the interests of the petitioning workers."  Stidham v. U.S.

---

[2]Worker benefits available under the program established by the Trade Act of 1974 are denominated "*trade* adjustment assistance," while those available under the NAFTA Implementation Act are referred to as "*transitional* adjustment assistance."  However, the two programs are very similar, and, for the sake of convenience, both are generally referred to herein as "trade adjustment assistance," except as otherwise specifically noted.

Congress recently consolidated both the TAA and NAFTA-TAA programs into a new, expanded benefits program under the Trade Act of 2002.  *See* Pub. L. No. 107-210, § 123, 116 Stat. 933, 944 (2002).  However, because the Workers' petition for benefits predates November 4, 2002 (the effective date of the new statute), this action is governed by the NAFTA-TAA statute.  *See* Former Employees of Rohm and Haas Co. v. Chao, 27 CIT ____, ____ n.1, _____ n.3, _____, 246 F. Supp. 2d 1339, 1342 n.1, 1343 n.3, 1348 (2003).

Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (*citing* Abbott v. Donovan, 7 CIT 323, 327-28, 588 F. Supp. 1438, 1442 (1984) (quotations omitted) ).

Thus, while the Labor Department is vested with considerable discretion in the conduct of its investigation of trade adjustment assistance claims, "there exists a threshold requirement of reasonable inquiry." Former Employees of Hawkins Oil and Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993). Courts have not hesitated to set aside agency determinations which are the product of perfunctory investigations.[3]

---

[3]*See*, *e.g.*, Hawkins Oil and Gas, 17 CIT at 130, 814 F. Supp. at 1115 (castigating agency for "a sloppy and inadequate investigation" which was "the product of laziness," and holding that a fourth remand would be "futile"); Local 116, Int'l Union of Electronic, Electrical, Salaried, Mach. and Furniture Workers v. U.S. Sec'y of Labor, 16 CIT 490, 493-94, 793 F. Supp. 1094, 1096-97 (1992) (criticizing agency efforts as "cursory at best," and finding that "there was actually no investigation done whatsoever"); Former Employees of Alcatel Telecomms. Cable v. Herman, 24 CIT 655, 664 (2000) (concluding that "the administrative record reveal[ed] no more than an inadequate investigation lacking detail" where, *inter alia*, agency based its negative determination on responses to wrong type of questionnaire and failed to verify accuracy of company's questionnaire responses); Former Employees of Swiss Indus. Abrasives v. United States, 17 CIT 945, 949-50, 830 F. Supp. 637, 641-42 (1993) (characterizing agency's actions as "unreasonable" and its investigation as "misguided and inadequate at best" where agency, *inter alia*, failed to clarify important aspects of information provided by company, relied on company's unsubstantiated statements on critical point, and ignored other relevant information); Former Employees of Pittsburgh Logistics Sys., Inc. v. U.S. Sec'y of Labor, Slip Op. 03-111, 2003 Ct. Intl. Trade LEXIS 111, * 32 (Aug. 28, 2003) ("conclud[ing] that Labor . . . conducted an inadequate investigation and analysis of the plaintiffs as 'production' workers" and, similarly, that "Labor's service worker [analysis was] inadequate"); Former Employees of Tyco Elecs. v. U.S. Dep't of Labor, 27 CIT ___, ____, 264 F. Supp. 2d 1322, 1330 (2003) (holding that "Labor's failure to collect any information from Plaintiffs, as well as Labor's rejection of the . . . information voluntarily submitted by the Plaintiffs was a result of Labor's arbitrary and capricious treatment of [the] remand investigation"), 1331 (finding "Labor's reliance on . . . incomplete customer surveys to be insufficient to support Labor's conclusion" and criticizing Labor's "fail[ure] to conduct any independent import analysis which might have substantiated or contradicted the information reported by the customers"), 1331-32 (castigating Labor for flouting court remand instructions by failing to further investigate alleged shift of production to Mexico and for inappropriately relying on, *inter alia*, "unverified statements from an untitled . . . company official"); Former Employees of Marathon Ashland Pipeline, LLC v. Chao,

## B. The Facts of This Case

The Workers' former employer, Ameriphone, specialized in communications and related technologies to meet the requirements of the hearing-impaired, deaf and other special needs communities. Product lines included telephones with specialized volume control, text (TTY) telephones for the deaf, bed-shaking alarm clocks for the deaf, and other similar specialized communication, notification and emergency response systems. A.R. 3, 20, 28-29. Although volume production of most items occurred in China (with initial assembly by a subcontractor there), merchandise was then shipped to Ameriphone (in California), where employees – *inter alia* – inspected and tested the products, performed necessary repairs and refurbishment, and completed upgrades and modifications as appropriate. Ameriphone employees also designed and built prototypes. A.R. 28-29; 68 Fed. Reg. 60,120.

After Plantronics acquired Ameriphone in January 2002, much of the work performed by Ameriphone employees was shifted to a Plantronics facility in Tijuana, Mexico. Complaint; A.R. 3, 28; 68 Fed. Reg. 60,120. Some 20-plus employees were laid off, effective June 30 and July 30, 2002. A.R. 3. In late June 2002, three of those employees filed a petition for NAFTA-TAA benefits.

---

2003 Ct. Intl. Trade LEXIS 66, *41 (2003)(ordering Labor Department to certify workers where employer failed to adequately respond to agency inquiries and "[n]othing in the record indicate[d] that [the employer] w[ould] be more forthcoming if the court were to remand again" and where "[n]othing in the record indicate[d] that Labor ha[d] the resources or willingness to conduct an investigation beyond making inquiries of [employer]"); Chevron I, 26 CIT at ____ n.25, 245 F. Supp. 2d at 1334 n.25 (condemning Labor Department's investigation as sloppy, incomplete and "*pro forma* at best"); Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, Slip Op. 03-96, 2003 Ct. Intl. Trade LEXIS 93, *39 (July 28, 2003) (criticizing Labor Department investigation where agency "repeatedly failed and refused to seek relevant data and to make a determination as to whether imports . . . contributed importantly" to workers' separation).

A.R. 3. However, the Labor Department found that the Workers "provided administrative, technical, sales and distribution services" and thus did not produce an article as required for certification as "production workers" under the NAFTA-TAA statute. The agency further found that the Workers failed to satisfy the requirements for certification as service workers. The Labor Department therefore denied the Workers' petition. A.R. 19-21, 22-23; 67 Fed. Reg. 61,160, 61,162.

The Workers timely sought reconsideration of the denial, describing their duties in detail and explaining that those duties constituted "the final phase of production." A.R. 28-29. The Labor Department nevertheless denied reconsideration, concluding that – with few exceptions – the Workers' duties did not constitute "production" within the meaning of the statute, and that those exceptions – product modification, prototype production and product upgrades – accounted for only "a negligible portion" or "a negligible percentage" of the work performed at the plant. The agency further found that the Workers did not produce packaging or updated literature, and that the generation of "fault reports" did not constitute "production." In addition, the agency found that "components were added either as part of repair work, or were intermittent and not significant enough to qualify" as "production." Accordingly, the Labor Department again concluded that the Workers were in fact service workers. The agency reiterated its earlier conclusion that the Workers failed to satisfy the requirements for certification as service workers as well. A.R. 32-35, 37-38; 68 Fed. Reg. 12,938.

This appeal followed. In lieu of filing an Answer with the Court, the Government sought and was granted a voluntary remand "to conduct a further investigation and to make a redetermination"

as to the Workers' eligibility for NAFTA-TAA benefits.  Former Employees of Ameriphone, Inc.

v. United States, Slip Op. 03-72, 2003 WL 21508227, *1 (Ct. Int'l Trade June 25, 2003).

On remand, the Labor Department "contacted [Plantronics] and requested detailed

information regarding the workers' functions . . . . The newly obtained information revealed that

[the] workers . . . were engaged in production.  The new information also revealed that a significant

proportion of the production performed at the [Ameriphone] facility was shifted to Mexico." 68 Fed.

Reg. 60,120.  The Labor Department therefore concluded "that a shift of production to Mexico of

products like or directly competitive with those produced at [Ameriphone] contributed importantly

to the decline in sales or production and to the . . . separation of [Ameriphone] workers," and

certified as eligible to apply for benefits all Ameriphone workers "who became totally or partially

separated from employment on or after June 24, 2001 through two years of [the] certification." *Id*.[4]

---

[4]The Labor Department's initial Notice of Revised Determination on Remand – issued
August 18, 2003 – erroneously certified the Workers as eligible for *TAA* (rather than *NAFTA-TAA*)
benefits.  *See* A.R. 53 (certifying eligibility "to apply for adjustment assistance under Section 223
of the Trade Act of 1974"); 68 Fed. Reg. 53,399 (Sept. 10, 2003).  The agency corrected the statutory
reference in a subsequent notice, but back-dated that corrected certification to the date of the initial
certification.  *See* A.R. 58 (notice marked "Corrected: September 9, 2003" but back-dated to August
18, 2003, certifying eligibility "to apply for NAFTA-TAA under Section 250 of the Trade Act of
1974"); 68 Fed. Reg. 54,490 (Sept. 17, 2003).  That notice was, in turn, reissued on October 1, 2003,
certifying the Workers as of that date.  Notice of Revised Determination on Remand (Corrected:
October 1, 2003); 68 Fed. Reg. 60,120 (Oct. 21, 2003).

The Labor Department has now expressly confirmed that all Ameriphone employees "totally
or partially separated from employment on or after June 24, 2001" *through October 1, 2005* are
eligible to apply for NAFTA-TAA benefits.  *See* C.A.R. 50 (confirming that, as used in the
certification, the phrase "through two years of this certification" means "through two years [from the
date] of this certification"); 68 Fed. Reg. 60,120.

## II. **Analysis**

The Labor Department's belated affirmative determination is relatively cold comfort to the Workers here, who lost their jobs more than a year ago and had to haul the agency into court to force the agency to take a hard look at their claim. On the one hand, the Government is to be commended for recognizing the need for a voluntary remand. On the other hand, the agency's about-face as a result of that remand simply highlights the fact that the agency should have certified these Workers in the first place, within 40 days of receipt of their petition.

Here, the entirety of the Labor Department's initial investigation consisted of forwarding the standard NAFTA Transitional Adjustment Assistance Confidential Data Request Form to Plantronic's Vice President for Human Resources. C.A.R. 10-13.[5] The record reveals that the agency failed to follow up with company officials (via telephone or otherwise), even though the company's responses to the Labor Department questionnaire were, in a number of instances, ambiguous or inconsistent, and called for clarification.

For example, the company's questionnaire responses in one place flatly asserted that "[n]o products were produced" at Ameriphone's facility. C.A.R. 15. But that seemingly definitive statement was undercut by other, much more qualified responses given elsewhere in the same questionnaire, which hedged that the Ameriphone facility was not responsible for "*volume production of standard products*" and that "*standard products . . .* [were] manufactured through a

---

[5]The second page of the five-page questionnaire is missing from the administrative record. *Compare* C.A.R. 10 (page 1 of 5) *with* C.A.R. 11 (page 3 of 5).

subcontractor arrangement in China." C.A.R. 14, 16 (emphasis added).[6] And other responses acknowledged that some Ameriphone operations personnel were involved in "rework and assembly," "customization of special orders," and "final assembly." C.A.R. 14, 16-17.

Indeed, the company itself chose the term "production" to describe the duties of a significant percentage of the affected workers. *See* C.A.R. 17 (describing workers' duties as "production/repair/rework"). This and other critical information was either overlooked or simply ignored in the Labor Department's preparation of the Findings of the Investigation and in its initial Negative Determination. C.A.R. 18; A.R. 19-21.

Moreover, the agency's investigation conducted in response to the Workers' request for reconsideration was little more than a rubber-stamp of its initial Negative Determination. The Labor Department's "reconsideration" consisted – in toto – of two phone conversations with company officials on a single day, which were in turn documented in two memoranda that, together, constituted a mere three sentences. C.A.R. 30-31.

Only after this action was filed and the voluntary remand granted did the Labor Department seriously probe the nature of the Ameriphone Workers' duties, pressing Plantronics representatives for the "comprehensive and detailed information about work functions at the [Ameriphone] facility" that was at the time still so conspicuously absent from the agency's files. A.R. 47. *See also* A.R.

---

[6]The record is devoid of any evidence that the Labor Department made any effort to discern the extent to which Ameriphone employees were engaged in "non-volume production" of "standard products" – or, for that matter, were engaged in "volume production" of "special order" or "customized products." Nor does the record reveal any analysis of the nature of the Workers' duties *vis-à-vis* "rework and assembly," "customization of special orders," and "final assembly," or why those duties did not constitute "production."

44 (posing specific, detailed questions to Plantronics).  It is particularly telling – and troubling – that the information which ultimately resulted in the certification of the Workers was obtained during the remand from the same company officials who had responded to earlier agency inquiries.  *Compare* C.A.R. 10, 30-31 *with* C.A.R. 45, 48.  It is thus obvious that the Labor Department could – and should – have elicited the necessary information much earlier, by scrutinizing the company's statements, seeking greater specificity and clarification, and reconciling the evident inconsistencies.

By regulation, the Labor Department is required "to marshal all relevant facts to make a determination" on TAA and NAFTA-TAA petitions.  29 C.F.R. § 90.12 (2002).[7]  The agency cannot rely on employers' blanket assurances that workers were, or were not, engaged in "production."[8] Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 26 CIT ____, 215 F. Supp. 2d 1345, 1352-53 (2002) (Labor Department's reliance on employer's conclusory assertions concerning "production" constituted impermissible abdication of agency's responsibility to interpret TAA statute and to define terms used in it).  Rather, the agency has an *affirmative obligation* to conduct its own independent "factual inquiry into the nature of the work performed by the petitioners" to determine

---

[7]The Labor Department never promulgated regulations specifically addressed to the NAFTA-TAA program.  In NAFTA-TAA cases, the agency and the courts have looked to the TAA regulations for guidance, where appropriate.  Former Employees of Oxford Auto. U.A.W. Local 2088 v. U.S. Dep't of Labor, Slip Op. 03-129 at 11 n.15 (*citing* Former Employees of Carhartt, Inc. v. Chao, Slip Op. 01-71 at 9 n.5 (2001) ).

[8]Nor can the agency rely on the unverified statements of company officials in the face of factual discrepancies in the record, as it did in this case.  *See generally* Chevron I, 26 CIT at ____ n.9, 245 F. Supp. 2d at 1326 n.9 (and cases cited there); Former Employees of Pittsburgh Logistics Sys., Inc. v. U.S. Sec'y of Labor, Slip Op. 03-32, 2003 Ct. Intl. Trade LEXIS 18, *24 (February 28, 2003) (*citing* Former Employees of Shaw Pipe v. U.S. Sec'y of Labor, 21 CIT 1282, 1289, 988 F. Supp. 588, 592 (1997) ); Oxford Auto., Slip Op. 03-129 at 10 n.14 (and cases cited there).

whether or not that work constituted "production." Chevron I, 26 CIT at ____, 245 F. Supp. 2d at 1327-28 (*quoting* Former Employees of Shot Point Servs. v. United States, 17 CIT 502, 507 (1993)). The Labor Department here failed to properly discharge that duty.

While this case is troubling enough when viewed in isolation, it is even more troubling if it is viewed in the context of other TAA and NAFTA-TAA cases appealed to this Court. The relatively high number of requests for voluntary remands in such cases suggests that the Labor Department may be routinely failing to "conduct [its] investigation with the utmost regard for the interests of the petitioning workers" and to "marshal all relevant facts" before making its determinations. Stidham, 11 CIT at 551, 669 F. Supp. at 435; 29 C.F.R. § 90.12. There is something fundamentally wrong with the administration of the nation's trade adjustment assistance programs if, as a practical matter, workers often must appeal their cases to the courts to secure the thorough investigation that the Labor Department is obligated to conduct by law.[9]

To be sure, the statutory deadlines for the completion of investigations are tight. And – given the current state of the economy – the Labor Department is, no doubt, inundated with claims. *See generally* Pittsburgh Logistics, 2003 Ct. Intl. Trade LEXIS 18, *9-10, *32; Former Employees of

---

[9]Of course, for various reasons (including, for example, a blind faith in the Labor Department and its discharge of its duties), the vast majority of workers whose petitions are denied never challenge the agency's determinations in court. Thus, the claims of many workers may *never* have been the subject of thorough investigation; and, obviously, some percentage of those claims were meritorious.

It would be wholly inconsistent with Congress' intent if the trade adjustment assistance programs were to become little more than "claims mills," where all but the most well-documented and patently meritorious claims were denied at the agency level, and thorough investigations were largely reserved for those few cases which were appealed to the courts.

<u>Tyco Elecs. v. U.S. Dep't of Labor</u>, 27 CIT \_\_\_\_, \_\_\_\_\_, 259 F. Supp. 2d 1246, 1249 (2003).[10] But, if the agency's resources are not adequate to enable it to meet its statutory mandate, the remedy lies with Congress. The volume of claims filed with the agency cannot serve to excuse it from fulfilling its legal obligations *vis-à-vis* the legions of displaced workers. Indeed, if anything, the volume of claims filed serves to underscore the vital nature of the agency's mission.

### III. <u>Conclusion</u>

It can hardly be said that "all's well that ends well," when the Workers here have been for over a year deprived of the job training and other benefits to which they are entitled. But, as a result of the voluntary remand, the Labor Department has now certified the Workers as eligible to apply for NAFTA transitional adjustment assistance; and the Workers have advised that they are satisfied with that certification. The Final Corrected Remand Determination is therefore sustained. *See* 68 Fed. Reg. 60,120 (Oct. 21, 2003).

Judgment will enter accordingly.

_____
Delissa A. Ridgway, Judge

Decided: October 24, 2003
New York, New York

_____

[10]The Labor Department's resources have also been strained by implementation of the new, expanded trade adjustment assistance program under the Trade Act of 2002. <u>Tyco</u>, 27 CIT at \_\_\_\_, 259 F. Supp. 2d at 1249.